## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
Case No. 07-21403-CIV-COHN/SELTZER

**ANTONIO HERNANDEZ,**
Individually and on behalf of all
others similarly situated,

     Plaintiff,

  v.

**IGE U.S. LLC,**
a Delaware corporation,

     Defendant.
_____/

## DEFENDANT IGE U.S. LLC'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Defendant IGE U.S. LLC a/k/a Affinity Media Holdings, LLC ("IGE U.S.") respectfully submits this memorandum of law in opposition to the Motion for Class Certification [D.E. 47] filed by Plaintiff Antonio Hernandez ("Hernandez"). Because Hernandez lacks standing to bring this lawsuit, and because certification would be contrary to Federal Rule of Civil Procedure 23, the Court should deny the motion for class certification and dismiss this lawsuit.

### I.  INTRODUCTION

This case is about a game called *World of Warcraft*. In it, players pretend to be medieval characters engaged in what Hernandez calls "a fantasy world experience." *See* Amended Class Action Complaint [D.E. 5] (hereinafter "AC") ¶ 32. The principal issue here is whether Hernandez has the right to prosecute a federal class action in a quest to "level the playing field" for an estimated two million people who play in his fantasy world. The answer is no, he does not. In fact, one of the two agreements upon which Hernandez relies in bringing this lawsuit, the End User License Agreement, states that *World of Warcraft* players "have no interest, monetary or otherwise, in any feature or content contained in the Game." AC Exh. A, at 5.

This and other contractual language shuts the door on all of Hernandez's claims. Nevertheless, on May 19, 2008, Hernandez moved to certify a nationwide class and subclass consisting of all purchasers of *World of Warcraft* since November 27, 2004. *See* AC ¶ 33. While the 97-paragraph Amended Complaint is replete with allegations of "consumer fraud" and

Dockets.Justia.com

a vast "scheme" and "conspiracy" by IGE U.S. and certain unnamed collaborators, it fails to allege the most basic facts to support a finding that (1) Hernandez suffered an injury sufficient to endow him with Article III standing, or (2) that a favorable decision by this Court could redress his alleged injury. Indeed, the very agreements upon which Hernandez bases his disparate claims for relief conclusively foreclose him from maintaining this lawsuit.

Beyond that, class certification is inappropriate for several reasons. <u>First</u>, Hernandez cannot satisfy the "typicality" and "adequacy of representation" requirements of Rule 23(a)(3) and (a)(4). His stated goal of ending real money trading (or "RMT") is directly at odds with other members of the putative class. Many *World of Warcraft* players engage in RMT because it enhances their game playing experience. Those players – who are all within the class proposed by Hernandez – are aligned squarely against him. In fact, based on the legal theories advanced by Hernandez, the members of the class would have innumerable causes of action against each other. Certification is obviously unavailable under these circumstances.

<u>Second</u>, Hernandez cannot satisfy any of the requirements of Rule 23(b). For instance, although he insists that his injuries are "exclusively economic," Memo. at 24-25[1], he nonetheless seeks certification under Rule 23(b)(1) and (b)(2), arguing that his claims for money damages are only "incidental" to his goal of obtaining an injunction against IGE U.S. *Id.* at 19-21. Yet it is readily apparent that the only relief conceivably available is monetary, since IGE U.S. is not engaged in any business of any kind. Further, Hernandez cannot hope to satisfy the predominance requirement of Rule 23(b)(3). His putative nationwide claims raise a host of highly individual factual and legal questions that make class treatment unworkable.

<u>Finally</u>, Hernandez seeks to represent a subclass of which he is not a member. The subclass purportedly comprises people "who bought any *World of Warcraft*® gold for real money." AC ¶ 33. Not only are members of this subclass impossible to identify, Hernandez has testified that he never bought gold for real money. That means the subclass cannot be certified.

## II. BACKGROUND

Though it may not be clear from the grave tone of the Amended Complaint, *World of Warcraft* is nothing more than a game. It is an "escape" that Hernandez plays because he thinks it is "fun." *See* Deposition of Antonio Hernandez (June 6, 2008) (hereinafter "Hernandez Dep.")

---

[1]      Citations to Plaintiff's Memorandum in Support of Motion for Class Certification [D.E. 48] are referenced throughout this opposition as "Memo. at __."

{M2695069;1}

at 72-73 (excerpts attached hereto as "Exhibit A"). More precisely, *World of Warcraft* is a massively multiplayer online role playing game ("MMORPG") in the tradition of *Dungeons & Dragons* – only *World of Warcraft* is played over the internet rather than on a tabletop, and by millions of people around the world rather than small groups of friends.[2]

Hernandez is what some people would call a "hard core" gamer. He considers himself an "expert" *World of Warcraft* player. Hernandez Dep. at 31-32 (Exh. A). He spends "most of his free time" playing the game (*id*. at 124), which he estimates to be about "35-plus to 40-plus" hours each week, sometimes more (*id*. at 121-25). He attends class and studies for about twenty hours each week. He is not currently employed. *Id*. at 22-24. In all, Hernandez has devoted close to a full year of his life – some 7,000 hours – to playing *World of Warcraft*. *Id*. at 167.

Before he could ever play *World of Warcraft*, Hernandez had to enter two agreements with the game's creator, Blizzard Entertainment, Inc. ("Blizzard"). These agreements – which Hernandez has read and fully accepts – are called the End User License Agreement ("EULA") and the Terms of Use Agreement ("TOU"). AC ¶¶ 14-15. Copies of both agreements are attached to the Amended Complaint as Exhibits A and B, respectively.

The agreements make it abundantly clear that *World of Warcraft* is nothing more than a game. Both the EULA and the TOU use the defined term "Game" to refer to *World of Warcraft*. AC Exh. A, at 1 & Exh. B, at 1. The TOU further states that Blizzard is the sole entity authorized to enforce whatever rules or norms exist in the game. Under the heading "Rules of Conduct," the TOU provides that the rules are "maintained and enforced exclusively by Blizzard," and that "Blizzard reserves the right to determine which conduct it considers to be outside the spirit of the Game and to take such disciplinary measures as it sees fit up to and including termination and deletion of the Account." AC Exh. B, at 3. Blizzard also expressly "reserves the right to modify these Rules of Conduct at any time." *Id*. ¶ 5.

Indeed, if there is one thing the EULA and TOU make clear, it is that Blizzard owns the game, its content, and every conceivable aspect of game play. For example, the EULA states that players "have no interest, monetary or otherwise, in any feature or content contained in the Game" (AC Exh. A, at 5 (¶ 13)), while the TOU provides that:

---

[2]     The first definition of "game" provided by Merriam-Webster is an "activity engaged in for diversion or amusement." *See* Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/game (last visited June 13, 2008).

{M2695069;1}

Blizzard owns, has licensed, or otherwise has rights to all of the content that appears in the Program. <u>You agree that you have no right or title in or to any such content, including the virtual goods or currency appearing or originating in the Game</u>, or any other attributes associated with the Account or stored on the Service.

AC Exh. B, at 7 (¶ 8) (emphasis added).

Even the players' accounts are owned by Blizzard. The TOU is unequivocal on this point: "Notwithstanding anything to the contrary herein, you acknowledge and agree that you shall have no ownership or other property interest in the Account, and you further acknowledge and agree that all rights in and to the Account are and shall forever be owned by and inure to the benefit of Blizzard." AC Exh. B, at 2 (¶ 3).

If a player does not like the game – or the way Blizzard is administering the game – he or she may complain to Blizzard or simply stop playing. Both the EULA and the TOU permit players to terminate their agreements with Blizzard "at any time." AC Exh. A, at 3 (¶ 6) & Exh. B, at 7 (¶ 10). By the same token, the EULA and the TOU allow Blizzard to terminate its relationship with any subscriber "at any time for any reason or no reason." *Id.*

One thing players clearly may not do is sue Blizzard for any loss or damage to their playing experience. The EULA, for example, makes clear that:

> **NEITHER BLIZZARD NOR ITS PARENT, SUBSIDIARIES OR AFFILIATES SHALL BE LIABLE IN ANY WAY FOR ANY LOSS OR DAMAGE OF ANY KIND ARISING OUT OF THE GAME OR ANY USE OF THE GAME, INCLUDING . . . ANY LOSS OR DAMAGE TO PLAYER CHARACTERS, VIRTUAL GOODS (E.G., ARMOR, POTIONS, WEAPONS, ETC.) OR CURRENCY**, ACCOUNTS, STATISTICS, OR USER STANDINGS, [or] RANKS ….

AC Exh. A, at 4 (¶ 11) (emphasis added).

It is against this backdrop that Hernandez seeks to certify a nationwide class.

### III. ARGUMENT

A class action "may only be certified if the trial court is satisfied, after a <u>rigorous analysis</u>, that the prerequisites" of Rule 23 are satisfied. *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982) (emphasis added). Rule 23(a) establishes four prerequisites to certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). Even if all of these requirements are all met, Hernandez must still satisfy one of the three provisions of Rule 23(b). *See Hammett v. Am. Bankers Ins. Co. of Fla.*, 203 F.R.D. 690, 695 (S.D. Fla. 2001).

In conducting this searching inquiry, the Court may look beyond the pleadings. *See Sampaio v. People First Recoveries, LLC*, No. 07-22436-Civ., 2008 WL 509255, at *2 (S.D. Fla. Feb. 19, 2008) ("[T]he Court may look beyond the pleadings in determining whether to grant Plaintiff's Motion for class certification."). The Court should not, however, "rely on conclusory allegations which parrot the provisions of Rule 23 to support certification." *Brooks v. S. Bell T&T Co.*, 133 F.R.D. 54, 56 (S.D. Fla. 1990).

**A.       Hernandez Lacks Standing to Bring This Lawsuit**

"The Federal Rules of Civil Procedure cannot expand the subject matter jurisdiction of federal courts beyond the limits of the U.S. Constitution." *Live Entertainment, Inc. v. Digex, Inc*. 300 F. Supp. 2d 1273, 1279 (S.D. Fla. 2003). Any analysis of class certification, therefore, "must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987); *Bowen v. First Fin. Servs., Inc*., 233 F.3d 1331, 1339 n.6 (11th Cir. 2000) (that the plaintiff styles suit as class action "does not affect [his] burden of showing that [he] individually satisf[ies] the constitutional requirement of standing"). If Hernandez cannot establish an Article III case or controversy, he cannot seek relief on behalf of himself or anyone else.

The elements of constitutional standing are well established. Hernandez must show (1) that he has suffered an injury-in-fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that his injury is fairly traceable to conduct of IGE U.S.; and (3) that it is likely, not just merely speculative, that his injury will be redressed by a favorable decision. *Live Entertainment*, 300 F. Supp. 2d at 1279; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

**1.       Hernandez cannot establish an Article III injury.**

Hernandez lacks standing for at least two reasons. First, he has not suffered an Article III injury. *See Lujan*, 504 U.S. at 560. An injury-in-fact "arises from the invasion of a <u>legally protected interest</u> that is sufficiently concrete and particularized, and not abstract and indefinite." *Williams v. Bd. of Regents*, 477 F.3d 1282, 1302 (11th Cir. 2007) (emphasis added). To be sure, Hernandez <u>claims</u> that IGE U.S. has deprived players of the "benefit" of the their "bargain" with Blizzard by selling gold for real money. Memo. at 6; AC ¶¶ 3, 23 & 32. He claims that all players have been "injured in their use and enjoyment" of *World of Warcraft*. Memo. at 16. He even accuses IGE U.S. of artificially inflating the value of virtual gold. *Id*. at 21; *see* AC ¶ 31(b).

These allegations, however, do not endow Hernandez with standing. Hernandez got exactly what he paid for in *World of Warcraft*: a working video game.[3] To this day he plays the game some "35-plus to 40-plus" hours per week, and pays the monthly subscription fee. *See* Hernandez Dep. at 121-25 (Exh. A). He has "no intention of quitting." *Id.* at 122. Hernandez has even pre-purchased the next 60 days of his subscription service. *Id.* at 121-22.

Hernandez clearly enjoys playing *World of Warcraft*, and he does not allege otherwise. Instead, he alleges that IGE U.S. has made it incrementally less "fun" for him to play – that IGE U.S. somehow undermined what Hernandez calls the "integrity" of the game:

> [I]n order to ensure the integrity of *World of Warcraft*® virtual world, [the] EULA and ToU expressly prohibit the sale of virtual assets for real money. This prohibition protects the integrity of *World of Warcraft*®, ensures that the competitive playing field within *World of Warcraft*® is level, and makes certain that the time, energy and effort expanded [sic] by Subscribers is not negatively impacted by others who use real money to purchase scarce and limited virtual resources.

AC ¶ 23. Put another way, Hernandez contends that he bargained for a certain <u>quality</u> of game play – one with a "level playing field" – and that the EULA and TOU permit him to sue IGE U.S. for allegedly interfering with that supposed bargain.

Hernandez is mistaken. The EULA makes clear that *World of Warcraft* subscribers have "**<u>no interest</u>, monetary or otherwise, in <u>any</u> feature or content contained in the Game**[,]" and that "Blizzard owns, has licensed, or otherwise has rights to **all content** that appears in the Program." AC Exh. A, at 5-7 (emphasis added). Similarly, through the TOU, Hernandez agreed that he has "**<u>no right or title in or to any such content, including the virtual goods or currency appearing or originating in the Game</u>, or any other attributes associated with the Account or stored on the Service**." AC Exh. B, at 7 (emphasis added). Hernandez does not even own his player account; Blizzard does. He agreed that "**all rights in and to the Account are and shall forever be owned by and inure to the benefit of Blizzard.**" *Id.* at 2 (¶ 3).

Indeed, the notion that there are <u>any</u> real "rules" to *World of Warcraft* is itself a fantasy. Blizzard reserves "the right to modify [the] Rules of Conduct at any time" (*id.* at 3); to "change, modify, suspend, or discontinue any aspect of the Game at any time" (AC Exh. A, at 5; Exh. B,

---

[3] Blizzard warrants only that the media containing the game will be "free from defects in material and workmanship" for 90-days after purchase. *See* AC Exh. A, at 4. More direct, Blizzard expressly disclaims liability "FOR ANY LOSS OR DAMAGE TO PLAYER CHARACTERS, VIRTUAL GOODS (E.G., ARMOR, POTIONS, WEAPONS, ETC.) OR CURRENCY, ACCOUNTS, STATISTICS, OR USER STANDINGS, RANKS, OR PROFILE INFORMATION[.]" AC, Exh. A. at 4 (¶ 11); *see also* note 4, *infra*.

at 7); to "impose limits on certain features or restrict [Hernandez's] access to parts or all of the Game without notice or liability" (AC Exh. A, at 5); and, "at its sole discretion," to "change, modify, add to, supplement or delete any of the terms and conditions of [the EULA] when Blizzard upgrades the Game Client" (*id.* at 4*)*. Blizzard may even "terminate [the EULA and TOU] at any time for any or no reason." AC Exh. A, at 3 (¶ 6); Exh. B, at 7 (¶ 10).

Hernandez understands and has expressly agreed to all of this. He has read the EULA and TOU. He does not contend that any of their provisions are inapplicable to him. *See* Hernandez Dep. at 88-90, 94-95, 302-05 ("Q: You understand, do you not, that pursuant to this [EULA], Mr. Hernandez, you have no interest, monetary or otherwise, in any feature or content contained in World of Warcraft, right? A: As pursuant to this claim – as pursuant to this, yes, it states that there. Q: And that's binding on you, right? A: Correct. Q: All of those provisions we just talked about are clear to you, are they not? A: Correct."), 313-15 & 319-21 (Exh. A).

Thus, as a matter of law, Hernandez has no stake in any aspect of *World of Warcraft*, and any expectation to the contrary is unreasonable.[4] *See generally Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 107 (1998) ("[P]sychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."); *see also Air Freight, Inc. v. Transworld Systems*, 22 F.3d 773, 774 (7th Cir. 1994) ("That the Chicago Cubs turn out to be the doormat of the National League would not entitle the ticket holder to a refund for the remaining games, any more than the star tenor's laryngitis entitles the opera goer to a refund when the understudy takes over the role.") (Easterbrook, J.); *Stern v. Cleveland Browns Football Club, Inc.,* No. 95-L-196, 1996 WL 761163, at *6 (Oh. Ct. App. Dec. 20, 1996) (same for alleged "poor performance" by Cleveland Browns).

Furthermore, even assuming Hernandez could identify a right or interest in the "integrity" or "fairness" of the game (and he cannot), the TOU vests <u>exclusive</u> authority to enforce that purported interest with Blizzard:

---

[4]    To the extent Hernandez claims he has standing based on the purchase price of *World of Warcraft* or any of the monthly subscription fees, he is incorrect as a matter of law and common sense. *See Rivera v. Wyeth-Ayerst Labs*., 283 F.3d 315, 319-21 (5th Cir. 2002) (no standing where only alleged injury was the loss of cash due to the purchase of otherwise effective drug: "[m]erely asking for money does not establish an injury in fact"); *Prohias v. Pfizer*, 485 F. Supp. 2d 1329, 1334-37 (S.D. Fla. 2007) (plaintiffs could not establish Article III injury because they continued to purchase and take allegedly defective drug; *see also* AC Exh. A, at 2 (¶ 2) ("Once you accept the [EULA] and the [TOU], you will no longer be eligible for a refund.").

These rules of conduct (the "Rules of Conduct"), **maintained and enforced exclusively by Blizzard,** must be adhered to by all users of the Service. It is your responsibility to know, understand and abide by these Rules of Conduct. The following rules are not meant to be exhaustive, and **Blizzard reserves the right to determine which conduct it considers to be outside the spirit of the Game and to take such disciplinary measures as it sees fit up to and including termination and deletion of the Account**.

AC Exh. B, at 3 (emphasis added). Blizzard, in other words, has "all the attributes of a benevolent but absolute despot and all the disciplinary powers of the proverbial *pater familias*." *Milwaukee Am. Ass'n v. Landis*, 49 F.2d 298, 299 (N.D. Ill. 1931).[5] If Hernandez is unhappy with the game, he is free to petition Blizzard for relief, to play any one of the numerous other online games available to him, or to find another pastime.[6]

Hernandez may not, however, parlay his subjective disappointment into a lawsuit. The district court decision in *Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532, 545-46 (E.D. Va. 2003), aptly illustrates this point. The plaintiff there attempted to bring a class action against America Online, Inc. ("AOL"), alleging that AOL had wrongfully refused to prevent online chat participants from posting comments disparaging Islam. *Id.* at 534. The district court dismissed the plaintiff's breach of contract and third-party beneficiary claims as a matter of law because the rights he claimed were "simply not provided for in AOL's Member Agreement":

> The plain language of the Member Agreement makes clear that AOL is not obligated to take any action against those who violate its Community Guidelines. Thus, the Member Agreement provides that AOL "has the right to enforce them *in*

---

[5]     Since *World of Warcraft* is nothing if not a voluntary pursuit, the rule of judicial non-interference with voluntary associations supplies an additional reason to dismiss this lawsuit. "It is a well established proposition of Florida law that ordinarily courts will not intervene in the internal affairs of … voluntary associations." *Rewolinksi v. Fisher*, 444 So. 2d 54, 58 (Fla. 3d DCA 1984); *see Harper v. Hoecherl*, 14 So. 2d 179, 181 (Fla. 1943). The purpose of this rule is to ensure that endeavors like *World of Warcraft* are free from the "almost constant strife and turmoil over disputed questions of authority and policy" occasioned by judicial oversight. *See Harper*, 14 So. 2d at 181; *Schulz v. U.S. Boxing Ass'n*, 105 F.3d 127, 132 (3d Cir. 1997) ("[C]ourts have been understandably reluctant to interfere with the internal affairs of [private] associations and their reluctance has ordinarily promoted the health of society.") (internal quotes omitted) (brackets in original); *Crouch v. NASCAR*, 845 F.2d 397, 403 (2d Cir. 1988) ("We believe that federal courts are equally unfamiliar with standards such as 'race procedure decision' and 'lap and time penalty,' and thus should decline the plaintiffs' invitation to become the 'super-scorer' for stock car racing disputes."); *Oakland Raiders v. NFL*, 131 Cal. App. 4th 621, 645-46 (Cal. Ct. App. 2005) ("[T]here is significant danger that judicial intervention … will have the undesired and unintended effect of interfering with the League's autonomy in matters where the NFL and its commissioner have much greater competence and understanding than the courts.").

[6]     There are some very good reasons for Blizzard to reserve the exclusive right to interpret and enforce the "Rules of Conduct" in the TOU. For example, were it otherwise, every *World of Warcraft* subscriber could bring suit against every other subscriber for allegedly violating the Rules of Conduct. The specter of millions of gamers, all in competition with one another, and all armed with a legal cause of action based on the TOU is one that Blizzard (and, presumably, this Court) surely wishes to avoid.

*its sole discretion*," and that "if you … violate the AOL Community Guidelines, AOL *may* take action against your account." (emphasis added). The Member Agreement also states that "[y]ou understand and agree that the AOL Community and the AOL Privacy Policy, including AOL's enforcement of those policies, *are not intended to confer, and do not confer, any rights or remedies upon any person*." (emphasis added). The Member Agreement states that while AOL "reserve[s] the right to remove content that, in AOL's judgment, does not meet its standards or does not comply with AOL's current Community Guidelines … AOL is not responsible for any failure or delay in removing such material."

*Id*. In other words, the plaintiff's contractual claims were "barred by the very contract on which it relies[.]" *Id*. at 534.[7]

Here, too, the very agreements upon which Hernandez relies foreclose him from bringing suit. Hernandez insists that the EULA and TOU prohibit IGE U.S. from engaging in RMT, yet it is undisputable that he has no right to enforce those agreements – let alone a cognizable interest in *World of Warcraft* or any aspect of its game play. In short, Hernandez has not been legally injured, and has waived the right to pursue such injury in any event.[8]

### 2. Hernandez cannot establish redressibility, either.

Hernandez also lacks standing because he cannot show redressibility. "[I]t must be 'likely,' as opposed to merely 'speculative,' that [the alleged] injury will be 'redressed by a

---

[7]     Similarly, the notion that IGE U.S. somehow "devalued" Hernandez's imaginary gold (which he agrees he does not own) cannot establish standing or damages. AC ¶ 31(b); *see Prohias*, 485 F. Supp. 2d at 1336 (alleged "price inflation" damages "are too speculative to constitute injury-in-fact under Article III"). At best, Hernandez's price inflation theory makes his claim akin to one of price manipulation in the securities realm. But in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court held that the mere allegation that plaintiffs had paid "artificially inflated prices" and thereby suffered "damages" was insufficient because it failed the "simple test" of providing "fair notice" of the alleged grounds for plaintiffs' claim. *Id*. at 346-48.

[8]     Not only does Article III require Hernandez to demonstrate a concrete and particularized injury, each of his causes of action against IGE U.S. requires him to prove some form of loss or "damages" as an essential element: **(1)** breach of third-party contract, *Biscayne Inv. Group, Ltd. v. Guar. Mgmt. Servs., Inc*., 903 So. 2d 251, 254 (Fla. 3d DCA 2005) ("A cause of action for breach of contract brought by a third party beneficiary must include [an allegation of] damages to the third-party resulting from the breach."); **(2)** civil conspiracy, *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) ("A civil conspiracy requires … damage to plaintiff as a result of the acts done under the conspiracy."); **(3)** Computer Fraud and Abuse Act, *Lockheed Martin Corp. v. Speed*, 6:05-cv-1580, 2006 WL 2683058, at *3 (M.D. Fla. Aug. 1, 2006) (explaining that Act requires the plaintiff to establish, among other things, that he "suffer[ed] a root injury of damage or loss …."); **(4)** FDUPTA, *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (claims under Florida's Deceptive and Unfair Trade Practices Act have three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages"); **(5)** tortious interference, *Popular Bank of Florida v. R.C. Asesores Financieros, C.A*., 797 So. 2d 614, 622 (Fla. 3d DCA 2001) ("[An] essential element[] of a claim for tortious interference with a business relationship [is] . . . damages to the plaintiff as a result of the breach of the relationship."); and **(6)** trespass, *Blennis v. Hewlett-Packard Co*., No. C 07-00333, 2008 WL 818526, at *6 (N.D. Cal. Mar. 25, 2008) ("The tort of trespass to chattels lies where an intentional interference with possession of personal property has proximately caused injury.") (internal marks omitted). It is axiomatic that the failure to prove an essential element of a cause of action – such as "damages" – precludes a finding of liability. *See, e.g., AlphaMed Pharm. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1355 (S.D. Fla. 2006).

favorable decision.'" *Lujan,* 504 U.S. at 561 (citation omitted). Hernandez claims to seek an injunction against IGE U.S. (Memo. at 21), yet an injunction would do nothing to redress his fantastical injuries, because IGE U.S. is not engaged in any business and has no day-to-day operations or employees. *See* Declaration of Brock J. Pierce (June 12, 2008) ¶¶ 4-6 (filed concurrently herewith) (hereinafter "Pierce Decl."); Wright et al., 7AA FED. PRAC. & PROC.: Civil 3d § 1785.1, at 139 ("[I]n class actions if the defendant alters its conduct so that the claims of the class, as well as the representative party, become moot, then the action must be dismissed."); *Vermont Mobile Home Owners's Ass'n, Inc v. Lapierre*, 131 F. Supp. 2d 553, 558 (D. Vt. 2001) (injunction claim moot "because the [defendants] are no longer in the business of selling mobile homes, nor have they available vacant mobile home lots").

Hernandez cannot establish redressibility for another reason: there are numerous entities which are not parties to this lawsuit but which nonetheless engage in RMT and in-game spamming. *See* Hernandez Dep. at 261 (Exh. A); Declaration of Samuel S. Heywood (June 13, 2008) (hereinafter "Heywood Decl.") ¶¶ 3-4 & Exhs. A & E-F. *World of Warcraft* gold is fungible. Hernandez concedes, as he must, that he can purchase gold from any number of online vendors. *See* Hernandez Dep. at 264-65 (Exh. A). In fact, even though IGE U.S. has not engaged in any business for at least a year, Hernandez testified that "[g]old farming still goes on to this day," and that "the [*World of Warcraft*] economy itself is flooded with gold and the cost of [in-game virtual items] is still astronomical." *Id.* at 290.

The upshot is that regardless of the relief ordered by this Court, gold farming, in-game spamming – indeed, all of the conduct alleged in the Amended Complaint – will continue unabated. Hernandez lacks standing because a favorable decision by this Court will do nothing to redress his imaginary grievance. *See, e.g., Lujan* 504 U.S. at 571 (plaintiffs lacked standing where, among other failures, they could not establish redressibility); *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1171 (11th Cir. 2007) (plaintiff lacked standing because "the fast food market consists of <u>many</u> competitors, only two of which are McDonald's and Burger King," and consequently it required "too much speculation" to conclude that alleged harm was attributable to McDonalds's actions) (emphasis in original).

**B.    Hernandez Cannot Satisfy the Adequacy of Representation or Typicality Requirements of Rule 23(a).**

There are irreconcilable differences among the proposed class members that destroy adequacy and typicality. Rule 23(a)(4) mandates that Hernandez "fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry … serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchen Prods. Inc. v. Windsor,* 521 U.S. 591, 625 (1997). Under the related Rule 23(a)(3) doctrine of typicality, Hernandez must show that his claims are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 593 (N.D. Fla. 1998) ("The most prominent consideration [under Rule 23(a)(3)] is that there is an absence of an adverse interest between the representative parties and other members of the class.").

### 1. Certification is inappropriate because the proposed class is hopelessly divided.

While it is true, as Hernandez observes, that class members need not be "clones" (Memo. at 15), Hernandez obviously cannot represent individuals with interests antagonistic to his. *See Troup v. McCart*, 238 F.2d 289, 294 (5th Cir. 1956). But that is precisely what he is attempting to do. Hernandez purports to represent a class of all persons who purchased *World of Warcraft* since November 27, 2004, <u>including</u> players who engaged in RMT. AC ¶ 33; Hernandez Dep. at 59-60 (Exh. A). He asserts that nothing in this lawsuit "could conceivably put him at odds with any class member" and that his interests "are co-extensive and are not in conflict with the interests of the other Class members[.]" Memo. at 16-17.

This is demonstrably false. The very allegation that IGE U.S. "has sold massive quantities of … gold for millions of dollars since *World of Warcraft*® was released" (Amended Complaint ¶ 27) demonstrates that many subscribers flatly <u>disagree</u> with Hernandez about the subject matter of this lawsuit. Those subscribers – all of whom are within the class identified by Hernandez – want to engage in RMT. *See* Hernandez Dep. at 246-47 (Exh. A) ("Q: You know a lot of people engage in RMT who play World of Warcraft, correct? A: … Yes."). They purchased and will continue to purchase *World of Warcraft* gold because it enhances rather than diminishes their game playing experience.

Though IGE U.S. "does not have to show actual antagonistic interest, the potentiality is enough," *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1194 (11th Cir. 2003) (citations omitted), there is ample evidence of antagonism between Hernandez and other proposed class members. Internet message boards, for example, are full of testimonials in support of RMT. *See, e.g.,* Heywood Decl. ¶ 4, Exhs. B-D. Many of these people are casual players who rely on RMT to skip the more tedious aspects of the game (sometimes referred to as

"grinding"). Not everyone, after all, is an "expert" who can devote 35-plus hours each week to playing *World of Warcraft*. *Cf.* Hernandez Dep. at 31-32 & 122-24 (Exh. A).

Hernandez's professed desire to put an end to RMT puts him directly at odds with these proposed class members. This alone makes class treatment unavailable. *See Grimes v. Fairfield Resorts, Inc.*, No. 06-14363, 2007 WL 245128, at *3 (11th Cir. 2007) (upholding denial of class certification: "certification is inappropriate when class members have opposing interests <u>or</u> when [the class] consists of members who benefit from the same acts alleged to be harmful to other members of the class") (brackets and emphasis in original); *Valley Drug*, 350 F.3d at 1195 (Rule 23(a) certification inappropriate "where the economic reality of the situation leads some class members to have economic interests that are significantly different from–and potentially antagonistic to–the named representatives purporting to represent them").[9]

Indeed, there is another insurmountable problem with the proposed class: under Hernandez's theory of the case, the class members can sue <u>each other</u>. The crux of Hernandez's theory is that he has certain legal rights (e.g., "third party beneficiary" status) by virtue of the EULA and TOU allegedly entered between Blizzard and IGE U.S. *See, e.g.,* AC ¶¶ 43-48. By the same logic, though, Hernandez has legal rights by virtue of the EULA and TOU between Blizzard and <u>every other class member</u>. And each class member, in turn, would possess the same legal rights vis-à-vis every other class member.

The denouement of this story is a class set upon itself. Each and every class member could assert multiple causes of action against other class members based on the same legal theories advanced by Hernandez. It is indisputable (and conceded by Hernandez) that innumerable players have used "bots," "cheats," "mods," "power leveling," account transferring (or "gifting") or any number of other devices to gain an advantage in *World of Warcraft*. *See* Hernandez Dep. at 110-13, 221, 223-26, 229-31, 243-46 (Exh. A). Many have bought and sold

---

[9] *See Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (certification inappropriate where putative class "includes those who claim harm from the very same acts from which other members of the class have benefited" and requested injunction would "impose a significant restriction" on the way the latter group did business); *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 463 (N.D. Ala. 2003) (federal courts will not "certify a class 'when its members have opposing interest or <u>when it consists of members who benefit from the same acts alleged to be harmful to other members of the class.</u>'") (quoting *Pickett*, 209 F.3d at 1280) (emphasis in original); *Auto Ventures. Inc. v. Moran*, No. 92-426-CIV, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) ("[T]he class collapses into distinct groups of winners and losers, and the result i[s] a sharp dichotomy of experience [within the proposed class] that defeats any concept of 'commonality' or 'typicality' under Ruler 23."); *see also Bieneman v. City of Chicago*, 864 F. 2d 463, 465-66 (7th Cir. 1988) (proposed class of residents adversely affected by noise and pollution from O'Hare Airport could not be certified because some class members "undoubtedly derive great benefit from increased operations at O'Hare") (Easterbrook, J.).

gold for real money. *Id.* at 261 & 290. Some or all of these activities are arguably unfair, and many are prohibited by the TOU. *E.g.,* AC Exh. B, at 4-6. Consequently, if class treatment is afforded here, Hernandez or any other class member could assert a claim for "breach of third party beneficiary contract" (AC ¶¶ 43-48), violation of consumer protection laws (*id.* ¶¶ 65-76), or "tortious interference" (*id.* ¶¶ 82-85) against other class members. Quite obviously, a class cannot be certified in these circumstances.

  2.  **Hernandez cannot satisfy the typicality requirement because individual class members would be subject to unique and dispositive defenses.**

Rule 23(a)(3) typicality is also not present "if the class representatives are subject to unique defenses that could be central to the litigation." *Hively v. North Lake Foods, Inc*., 191 F.R.D. 661, 668 (M.D. Fla. 2000); *see Auto Ventures,* 1997 WL 306895, at *5. If the class identified by Hernandez is certified, IGE U.S. will have several unique defenses available to defeat the claims of individual class members. To give but a few examples:

•   Hernandez contends that the class members are legal beneficiaries of alleged agreements between Blizzard and IGE U.S. *See, e.g.,* AC ¶¶ 43-48, 81-85. However, one may not sue as a beneficiary of an agreement that he has materially breached.[10] Since more than a few class members have engaged in actions – e.g., "cheats," "hacks," "bots," and account gifting – that (in Hernandez's view) violate the EULA or TOU, those individuals' claims against IGE U.S. would be dead in the water.

•   The EULA and TOU contain "updates" and other variations from year to year, making each class member vulnerable to unique contractual defenses. *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 340 (4th Cir. 1998) ("[P]laintiffs simply cannot advance a single collective breach of contract action" where contracts "may vary from year to year and from franchisee to franchisee."); *see e.g.,* Important Changes in ToU– Localization, http://forums.worldofwarcraft.com/thread.html?topicId=62153827&sid=1 (last accessed June 10, 2008).

•   Many proposed class members have engaged in RMT (discussion, *supra.*), making them subject to numerous equitable and legal defenses. *See* note 10, *supra.*

_____

[10]     *See Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (discussing equitable defense of unclean hands); *Worthington v. Anderson*, 386 F.3d 1314 (10th Cir. 2004) (upholding denial of relief based on doctrine of unclean hands); *see also* Rest. (Second) Contracts § 309; *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 632 (D.C. Cir. 1989) ("[A] third party beneficiary … is therefore subject to any claim or defense that the promisor would have against the promisee.").

{M2695069;1}

- Numerous proposed class members played *World of Warcraft* entirely after IGE U.S. was no longer engaged in business. *See* Pierce Decl. ¶¶ 3-6. Those players could not possibly have been affected by IGE U.S. and, therefore, may not participate in this lawsuit.

- Because Hernandez attempts to bring claims based on the common law and consumer protection statutes of all 50 states, *see, e.g.,* AC ¶¶ 73-76, the significant variations among these state laws (*see* discussion, *infra.* § III.C.3.b) also defeat typicality.

In sum, "[t]he factual variances in each class member's claim in this case, the unique defenses available to [IGE U.S.] regarding particular class members, and the varying state laws that would apply to the claims of the members of the proposed class, make it impossible for [Hernandez] to have claims typical of the proposed class." *Brooks*, 133 F.R.D. at 58.

### 3. The proposed subclass cannot be identified, let alone certified.

Apparently aware that his interests are "antagonistic to those of the proposed class" (Memo. at 16), Hernandez attempts to salvage class treatment by certifying a "Sub-Class" of individuals "who bought *World of Warcraft*® gold for real money." Memo. at 3; AC ¶ 33. He says the subclass consists of "Subscribers who have succumbed to the internal pressures to compete by engaging in RMT." Memo. at 2. He also suggests, without explanation, that the formation of this subclass will address the problems that plague the larger class:

> To the extent [Hernandez's] interests may diverge from other Subscribers with respect to his request for declaratory or injunctive relief, the issue has been properly addressed by the formation of a proposed Sub-Class of Subscribers who may have engaged in RMT in order to maintain their use and enjoyment of *World of Warcraft*® in view of IGE U.S.'s interference with the integrity of the virtual world.

Memo. at 18. This strategy is unavailing for several reasons.

First and foremost, Hernandez cannot represent the proposed subclass because he is not a member. *See Machella v. Cardenas*, 653 F.2d 923, 927 (5th Cir. 1981) ("'One may not represent a class of which he is not a part.'") (citation omitted); *Lucky v. Bd. of Regents*, No. 79-2420-Civ-JWK, 1981 WL 234, at *7 (S.D. Fla. June 29, 1981) (same). Hernandez testified that he has never even attempted to engage in RMT. *See* Hernandez Dep. at 218-19 (Exh. A). That precludes him from representing *World of Warcraft* gold purchasers.[11]

---

[11] For the same reason, Hernandez cannot establish typicality for the putative subclass. *See Shelley v. AmSouth Bank*, No. CIV. A. 97-1170-RV-C, 2000 WL 1121778, at *4 (S.D. Ala. Jul. 24, 2000) (Rule 23(a)(3)'s "typicality requirement bars a plaintiff from representing a class of which he is not a member"); *see also Andrews v.*

{M2695069;1}

Second, even assuming (solely for the sake of discussion) that the subclass could be certified, there is no way to identify its members. There is no master database of "Subscribers who may have engaged in RMT." AC ¶ 33. And if, as Hernandez suggests, there is a stigma associated with RMT (Hernandez Dep. at 243-45 (Exh. A)), there is little chance that such subscribers will come forward. The reality is that numerous individuals and entities are involved in RMT online and all over the world. Each vendor has its own customers. None of those vendors are parties to this case. Since the members of the subclass cannot be identified in the first place, there can be no certification. *See Perez v. Metabolife Int., Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) ("A court should deny class certification where … the number of individualized determinations required to determine class membership becomes too administratively difficult.").

Finally, the proposed subclass is itself divided. Hernandez claims it consists of players who "succumbed" to "pressure" to engage in RMT (Memo. at 2), and that the only person he knows who engaged in RMT "felt stupid he did it" (Hernandez Dep. at 243-45 (Exh. A)). Not everyone who purchased gold, however, is regretful. As explained elsewhere (*supra.* § III.B.1), many players support RMT. These players are not aligned with the other proposed subclass members, leaving the subclass splintered and making certification inappropriate.

## C. Certification Under Rule 23(b) Is Not Proper

Even if Hernandez could satisfy all requirements of Ruler 23(a), he can maintain a class action only by qualifying under one of the categories enumerated in Rule 23(b). In predictable fashion, Hernandez asserts that he qualifies under all three: Rule 23(b)(1), Rule 23(b)(2) and Rule 23(b)(3). He is incorrect on all counts.

### 1. Hernandez cannot satisfy Rule 23(b)(1).

Hernandez first seeks certification under Rule 23(b)(1), arguing in conclusory terms that he satisfies both subparts of the rule. *See* Memo. at 19-20. Rule 23(b)(1)(A) directs the Court to consider whether individual actions would "establish incompatible standards of conduct" for IGE U.S. *See* Fed. R. Civ. P. 23(b)(1)(A). There is no danger of that here, however, because the only relief even conceivably available to Hernandez is monetary, as IGE U.S. is no longer engaged in business. *See* Pierce Decl. ¶¶ 3-6; *see* § III.A.2, *supra*; Wright et al., 7AA FED. PRAC. & PROC.: Civ. 3d § 1785.1 (courts must consider mootness at certification stage).

---

*AT&T*, 95 F.3d 1014, 1022 (11th Cir. 1996) (holding that typicality is established only when "'a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes a wrong to the plaintiff.'").

{M2695069;1}

In fact, Hernandez seeks compensatory damages (*e.g.,* AC pg. 29), and contends that the putative class claims "<u>involve exclusive economic injury</u>" (Memo. at 24-25) (emphasis added). That makes an injunction unavailable in any event, and certification improper under Rule 23(b)(1)(A). *See Clausnitzer v. Fed. Exp. Corp.*, 248 F.R.D. 647, 663 (S.D. Fla. 2008) ("The Eleventh Circuit has held that certification under Rule 23(b)(1)(A) is unavailable where the plaintiff class seeks compensatory damages.") (citation omitted).

With respect to Rule 23(b)(1)(B), Hernandez offers no explanation why individual suits against IGE U.S. "as a practical matter, would be dispositive of the interests of the other members ... or would substantially impair or impede their ability to protect their interests[.]" Fed. R. Civ. P. 23(b)(1)(B); *see Camafel Bldg. Insp., Inc. v. Bellsouth Advert. & Pub. Corp.*, No. 1:06-CV-1501-JEC, 2008 WL 649778, at *10 (N.D. Ga. Mar. 07, 2008) (denying certification). Hernandez asserts that a court ruling could act as "collateral estoppel" with respect to future claims (Memo. at 20), but collateral estoppel only bars relitigation "of a previously decided issue when the parties are the same (or in privity)[.]" *In re SE Banking Corp.*, 69 F.3d 1539, 1552 (11th Cir. 1995) (emphasis added). Rule 23(b)(1)(B) is not in play here.

### 2. Certification under Rule 23(b)(2) is unavailable because the primary, and indeed only, relief available would be monetary.

Hernandez next seeks certification under Rule 23(b)(2), which provides that class treatment is appropriate if IGE U.S. has acted on grounds that apply generally to the class "so that final injunctive relief or corresponding relief is appropriate[.]" Fed. R. Civ. P. 23(b)(2). Not only is an injunction not the primary relief sought in this lawsuit, it is unavailable as a matter of law. Hernandez's self-serving rhetoric aside (Memo. at 18-21), the Amended Complaint <u>repeatedly</u> sets forth claims for <u>money damages</u>. *See* AC ¶¶ 48, 52, 62-63, 72, 76, 80, 85 & 90. That makes sense, since Hernandez's attorneys are apparently working on a contingency rather than hourly basis. *See* Hernandez Dep. at 324 (Exh. A).

Further, Hernandez has not attempted to explain how his alleged injury – an injury, it must be remembered, purportedly sustained by playing a video game – is "irreparable." On the contrary, he asserts that his claims "involve exclusive economic injury." Memo. at 24-25. It is black letter law that injunctive relief is unavailable without irreparable harm.[12] In fact, in order

---

[12]    *See R. Miller Arch., Inc. v. Edgington Enters., Inc.*, No. 6:06-cv-871, 2006 WL 2226297, at *7 (S.D. Fla. Aug. 3, 2006) (discussing "irreparable harm"); *225 West End Ave. Assocs. v. Bittorf,* No. 89 CIV. 7101, 1989 WL

{M2695069;1}

to obtain an injunction in the first place, Hernandez must prevail on one or more of his underlying claims, each of which requires a showing of loss or damage. *See* note 8, *supra*.

Since the "primary" – and indeed only – relief available is money damages, certification pursuant to Rule 23(b)(2) is inappropriate. *See Grillasca v. Hess Corp.*, No. 8:05-cv-1736, 2007 WL 2121726, at *15-16 (M.D. Fla. Jul. 24, 2007); *Collins v. International Dairy Queen, Inc.*, 168 F.R.D. 668, 675 (M.D. Ga. 1996) ("Although plaintiffs have an interest in obtaining declaratory and injunctive relief, the predominant nature of this case is for money damages.").

Hernandez also fails to satisfy Rule 23(b)(2) because many of the putative class members would be harmed by an injunction. *See* discussion § III.B. A Rule 23(b)(2) class is, "by its very nature, assumed to be a homogenous and cohesive group with few conflicting interests among its members." *James v. City of Dallas*, 254 F.3d 551, 571-72 (5th Cir. 2001). Due to the inability to opt out, the "(b)(2) class may require <u>more</u> cohesiveness than a (b)(3) class." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998) (emphasis added).

### 3. Certification under Rule 23(b)(3) is not proper because individual questions of law and fact predominate over common question.

Though Hernandez maintains that certification is "preferable" under Rules 23(b)(1) and (b)(2) (Memo. at 18), he nonetheless seeks to certify a class under Rule 23(b)(3) as well. This final prong of Rule 23(b) requires Hernandez to prove, among other things, that "questions of law or fact common to the members of the class predominate over questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3).

The predominance requirement is similar to but "'far more demanding than Rule 23(a)'s commonality requirement.'" *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (citation omitted). That is in part because "class treatment does not excuse each plaintiff from establishing the individual elements of its cause of action." *See Alabama v. Bird Body Co.*, 573 F.2d 309, 327 (5th Cir. 1978) ("[T]he fact that a case is proceeding as a class action does not in any way alter the substantive proof required to prove up a claim for relief."). Hernandez cannot establish predominance in this instance because highly individual factual and legal issues promise to make class treatment utterly unworkable.

---

140269, *2 (S.D.N.Y. Nov. 14, 1989) ("[I]t has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation ….") (internal marks omitted) (brackets in original).

### a.     *Individualized issues of <u>fact</u> will predominate.*

Certification is improper where the resolution of each class members' claims would require "distinctly case-specific inquiries into the facts" surrounding the claims. *Hammett*, 203 F.R.D. at 699. Hernandez has asserted nine (9) separate causes of action against IGE U.S., the resolution of which will require the Court to untangle at least the following factual issues with respect to each of the estimated two million members of the proposed class:

(i)     Whether and for how long each subscriber played *World of Warcraft* while IGE U.S. was engaged in business. *Cf.* Pierce Decl. ¶¶ 3-6.

(ii)     Whether each class member's alleged injury – including any alleged devaluation of virtual gold – was actually caused by IGE U.S. At his deposition Hernandez was unable to provide even <u>one</u> example of IGE U.S. having engaged in gold farming, and admitted that he does not know whether IGE U.S. has sent him a spam message within (at least) the past year-and-a-half. *See* Hernandez Dep. at 256, 270, 272-73 & 286-87 (Exh. A).

(iii)     Which class members engaged in RMT or any of the myriad other activities that Hernandez claims violate the TOU or EULA. This inquiry alone will overwhelm any common issues. Hernandez, for example, testified that certain "mods" (i.e., in-game modifications typically facilitated by third-party software) are prohibited by Blizzard, and that there is a wide range of opinion about the fairness of other mods. *See* Hernandez Dep. at 223-30 (Exh. A). In fact, it appears that Hernandez himself may have violated the TOU by, among other things, using certain mods and naming one of his characters after a popular cultural figure or persona. *See id.* at 225-26, 252 & 317; AC Exh. B, at 4.

(iv)     Whether there have been any material changes to the EULA or TOU from year to year, and how those variations impact the claims of individual class members.

(v)     The type and amount of damages sustained by each class member. *See In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 69 (S.D.N.Y. 2002) ("[T]he question whether an individual class member got his or her money's worth is inherently individual."); *Fischler v. AmSouth Corp.*, 176 F.R.D. 583, 588 (M.D. Fla. 1997) (since damages "issue will require case-by-case determination," it "weighs against certification of the class").

### b.     *Individual issues of <u>law</u> will predominate.*

"No class action is proper unless all litigants are governed by the same legal rules." *In re Bridgestone/Firestone*, 288 F.3d 1012, 1015 (7th Cir. 2002). Hernandez is attempting to assert

claims on behalf of a nationwide class comprising some two million people based on nine separate causes of action. The material differences among the state laws governing these causes of action are legion. They are guaranteed to make class treatment unworkable.[13]

To take but one example, Hernandez alleges that IGE U.S. violated Florida's Deceptive and Unfair Trade Practices Act (FDUPTA), Fla. Stat. § 501.201 *et seq.*, as well as the consumer protection statutes of the remaining 49 states, the District of Columbia and Puerto Rico. *See* AC ¶¶ 65-76. In *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 219 (E.D. Pa. 2000), the district court denied class certification in a case alleging violations of several state consumer fraud laws, reasoning that "[s]tate consumer protection acts vary on a range of fundamental issues." *See generally* J. S. Kiernan et al., *Developments in Consumer Fraud Class Action Law*, 537 PLI/Pat 237, 277 (1998). Among those variations are: (i) the scope of the right of action available, *id.* at 280; (ii) the availability of the class action device, *id.* at 281; and (iii) the legal definitions of "unfair" and "unconscionable," *id.* at 283. The court in *Lyon* concluded that "'distilling the laws of the fifty states … on the causes of action brought by consumer fraud plaintiffs would be an impossibly difficult task.'" 194 F.R.D. at 219 (quoting Kiernan, *supra*, at 279).

Without attempting to explain how the Court might manage this "impossibly difficult task," Hernandez asserts that the "central predominating question" in this lawsuit is whether "IGE U.S. engage in a common, coordinated scheme to market and sell *World of Warcraft*® gold in violation of the TOU and EULA, which violations caused the integrity of the virtual world to affected to the detriment of Mr. Hernandez and the Class[.]" Memo. at 23-24. This supposedly common question is really a legal conclusion that can be reached only after resolving all of the inquiries identified above. Certification is improper where, as here, the "'overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.'" *Andrew*, 95 F.3d at 1023 (11th Cir. 1996) (citation omitted).

---

[13] *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) ("The complexity of the trial would be further exacerbated to the extent that the laws of forty-eight states must be consulted[.]"); *Andrew v. AT&T*, 95 F.3d 1014, 1024 (11th Cir. 1996) ("Scrutinizing [the transactions] under the provisions of fifty jurisdictions complicates matters exponentially."); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (observing that non-common issues were "compounded exponentially" by choice of law considerations); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action."); *see also* 7A Wright et al., Fᴇᴅ. Pʀᴀᴄ. & Pʀᴏᴄ., Civil 3d § 1780.1, at 204 ("As a matter of general principle, … Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states[.]").

###### c.     *Class treatment is not a superior method of adjudication.*

Rule 23(b)(3) also requires Hernandez to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 529 (M.D. Ala. 1992). Among the non-exclusive factors to be considered in making this determination is "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 363 (S.D. Ga. 1996) (describing manageability as "the most frequent ground for holding that a class action is not superior") (internal marks omitted).

As already explained, class treatment poses intractable problems involving everything from identifying the class members, to determining whether and by whom they were injured, to resolving their claims under differing state laws. The litigation would quickly devolve into an interminable series of mini-trials involving all aspects of *World of Warcraft*. In other words, if Hernandez has his way, this Court will assume jurisdiction over an ever-expanding virtual world. *See Crouch*, 845 F.2d at 403 (declining invitation to become the "super-scorer" for stock car racing disputes). Suffice it to say that is not what the Rules of Civil Procedure contemplate.

## IV.  CONCLUSION

For all of the foregoing reasons, Defendant IGE U.S., LLC respectfully asks this Court to deny Plaintiff's Motion for Class Certification and to dismiss this lawsuit.

Dated:  June 13, 2008

Respectfully submitted,

**AKERMAN SENTERFITT**
One S.E. 3rd Avenue, 25th Floor
Miami, FL  33131-1714
Phone:  (305) 374-5600
Fax:  (305) 374-5095
Email:  james.miller@akerman.com

By: /s/  Samuel S. Heywood
James M. Miller, Esq.
Florida Bar Number:  201308
Samuel S. Heywood, Esq.
Florida Bar Number:  0016604

*Attorneys for Defendant IGE U.S., LLC*

## CERTIFICATE OF SERVICE

**I hereby certify** that true and accurate copies of the foregoing was served by using the Southern District of Florida's CM/ECF system on June 13, 2008, on all counsel or parties of record on the attached service list.

By: /s/ Samuel S. Heywood
Samuel S. Heywood, Esq.

<u>**SERVICE LIST**</u>

*Hernandez v. IGE U.S. LLC*, Case No. 07-21403-CIV (COHN/SELTZER)

C. Richard Newsome
newsome@newsomelaw.com
**NEWSOME LAW FIRM**
20 North Orange Avenue
Suite 800
Orlando, Florida  32801
Tel. (407) 648-5977
Fax (407) 648-5252

Donald E. Haviland, Jr.
haviland@havilandlaw.com
**THE HAVILAND LAW FIRM, LLC**
740 South Third Street, 3rd Floor
Philadelphia, Pennsylvania  19147
Tel. (215) 609-4661
Fax (215) 392-4400

*Attorneys for Plaintiff Antonio Hernandez*

James M. Miller, Esq.
james.miller@akerman.com
Samuel S. Heywood
samuel.heywood@akerman.com
**AKERMAN SENTERFITT**
One S.E. 3rd Avenue, 25th Floor
Miami, FL  33131-1714
Tel. (305) 374-5600
Fax  (305) 374-5095

*Attorneys for Defendant IGE U.S. LLC*